250

UNITED STATES, Appellee,

v.

Danforth WILLIAMS, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 66,705.

NMCM 90 0251.

U.S. Court of Military Appeals.

Argued Jan. 8, 1992.

Decided June 5, 1992.

For Appellant: *Lieutenant R.G. Arram-
bide*, JAGC, USNR (argued); *Captain
M.K. Schaller*, USMC (on brief).

For Appellee: *Major Laura L. Scudder*,
USMC (argued); *Colonel T.G. Hess*, USMC
(on brief); *Commander Thomas W. Os-
borne*, JAGC, USN, and *Major Rose M.
Favors*, USMC.

*Opinion of the Court*

WISS, Judge:

In a contested general court-martial by
military judge alone, appellant was convict-
ed of raping his 2–year–old stepdaughter [1]
and was sentenced to a dishonorable dis-
charge, confinement for 10 years, total for-
feitures, and reduction to the lowest enlist-
ed grade. The convening authority ap-
proved these results, and the Court of Mili-
tary Review affirmed without opinion.

We granted appellant's petition to consid-
er his claim that the evidence is insufficient
as a matter of law to sustain his conviction.
Specifically, he urges that the evidence is
legally insufficient to prove that he ever
had sexual intercourse with his stepdaugh-
ter. We disagree and affirm. *See Jackson
v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61
L.Ed.2d 560 (1979); *United States v. Har-
per*, 22 MJ 157 (CMA 1986).

Appellant and his wife married in Janu-
ary 1988; his wife had a daughter who, at
that time, was about 1 year old. The
record is not clear whether the family lived
together thereafter and if so, for how long.
It is apparent, though, that appellant's wife
and her daughter lived in Arizona with his
wife's mother and the mother's boyfriend—
apart from appellant—from September
1988 until December 23, 1988. On the lat-
ter date, appellant and his family were
reunited and moved into base housing in
California.

On January 20, 1989, appellant and his
wife took the little girl to the base emer-
gency room because she had excessive
vaginal discharge. There, following exami-
nations and laboratory tests, it was deter-

---

1. *See* Art. 120, Uniform Code of Military Justice,
10 USC § 920. Appellant was acquitted of an
additional charge alleging kidnapping his then-
estranged wife, in violation of Article 134,
UCMJ, 10 USC § 934.

mined that the girl had gonorrhea. As a precaution, appellant and his wife also were tested for the disease. Appellant's first test was inclusive because gonorrheal bacteria was not detected inside the white blood cells; however, appellant's sample was cultured and thereafter did reveal the bacteria.[2] His wife, however, never tested positive for the disease, even though they had engaged in a normal pattern of marital sexual intercourse.[3]

As trial counsel accurately phrased it at the outset of his closing argument: "[T]here are two central questions that have to be answered here today ... Did a rape occur; and was the accused the one who raped the step-daughter."

### Did a rape occur?

On February 10, 1989—three weeks after the gonorrhea was discovered—the child was examined by Dr. Herbert A. Giese, a medical doctor who was qualified at trial "as an expert in pediatrics and child sexual abuse." His examination included use of a culdescope—"an instrument which provides magnification from 5 to 30 power, has binocular vision and a good light source, specifically designed for examining light female genitalia." Through the culdescope, Dr. Giese was able to obtain two "photographs of the child's genitalia and particularly the hymenal ring." Referring to these pictures, Dr. Giese explained in a straightforward way the factors that, together, led him to conclude that the girl had been the victim of vulvar intercourse by the head of a penis.

The "first irregularity" was that "[t]he hymenal membrane ... was sort of floppy and redundant and it tended to stretch very easily." This feature "can be normal" and is distinctive only when considered with other factors revealed by the exam.

The "second irregularity" was "the bump at the 6 o'clock position." Although the bump itself may not be significant, the bump in this case "was bound to a vaginal ridge which was on the inside.... [T]his area was inflamed and then scar tissue bound the two together."

The next irregularity was the diameter of the hymenal ring when "stretch[ed] to a ... relaxed position." In this position, which offers an opening of the ring "to a maximum amount," the child's ring measured 6 millimeters from top to bottom and also from side to side. This contrasted with "the acceptable upper normal limit of normal for children under 5" years of age of 5 millimeters. Again, this factor, "in mind of itself, does not indicate that the child has been traumatized." Its significance is as one piece of the entire puzzle.

The fourth irregularity addressed two characteristics of the mound that Dr. Giese earlier had referred to as a "bump." The doctor pointed out "a white linear discoloration in the mound which I believe represents scar tissue." He continued:

[A]lso there is vascular disruption in this area; there's vascularity which runs out to it [the mound] and then stops and then there's vascularity on the other side which seems to come up approximately to it but there's no cross over of those blood vessels; whereas the rest of the hymen, there is a lacy pattern of blood vessels where [there] is no interruptions.

Dr. Giese explained "the significance of" this evidence as follows:

I think that is a scar in the hymen that occurred because of a tear that has rehealed itself; and the mound and attachment to the vaginal ridge are part of that healing process.

2. Apparently, there are a number of strains of gonorrhea, but for some reason neither the child nor appellant was tested to determine the particular strain each had. Although both of them had a type that is sensitive to penicillin, approximately 95% of gonorrhea found in the California and Arizona areas responds to penicillin, so the probative value of this factor seems rather slight.

3. Expert testimony at trial reflected that a negative result from a "vaginal culture" in an adult woman is not "conclusive"; "that is, the disease may be present but not detected by the culture."

He concluded: "She had a hymenal tear which has rehealed; and this occurred because of some form of hymenal penetration."

Attention then turned to the nature of the object that had penetrated the child. First, the doctor ruled out self-infliction. Even if she had masturbated, which, while "not real common with 2–year olds, it does occur, she would be paying attention up to the *superior* area where the clitoris is, because that is the sensitive area that induces a pleasural sensation." (Emphasis added.) It will be recalled that the evidence of a tear was in the *lower* "6 o'clock" area of the hymenal ring. Additionally, Dr. Giese observed that "[i]njury to the hymen is painful in children; and, in fact, touching the hymen in some children is an uncomfortable experience."

The question which next logically followed was: "Could those injuries that you noted have been caused by penetration from a male penis?" Dr. Giese responded:

> Yes, they could have but probably not full penetration. Full penetration, I would have expected much more damage and a larger opening. The most common source of partial dilation with a transection is a situation called vulvar intercourse which is when the head of the penis and the tip of the penis is placed in the introitous and pressure put against the area but there's not full penial intromission. Because of the conical shape of the head of the penis, as that began to press in, this would stretch the hymen until it reached the point that it couldn't give anymore and then it would tear; and I think that's what—and the most common place where injuries occur is at the 6 o'clock posterior area.

When asked, then, whether it was his "opinion ... that vulvar intercourse took place," Dr. Giese answered, "Yes."

At this point, trial counsel moved along to address the matter of the child having gonorrhea:

> Q. If you knew also that the child had had gonorrhea, would that add anything to your opinion as to what caused the injuries?
>
> A. Yes, it would further strengthen the opinion since Neisseria gonorrhoeae is a very fastidious organism and does not survive very long outside the human body and is transmitted, in my opinion, is prima facie information that the child had some form of sexual contact in order to acquire that.

Dr. Giese ruled out the possibility that the child had been born with the disease (it would have disappeared, even without treatment, long before her then-present age). Moreover, under rather extensive further examination by both trial and defense counsel, Dr. Giese found it "possible" but not probable for a number of reasons that the child had acquired the disease from a finger or some other foreign object. On redirect examination, trial counsel sought to quantify somewhat the terms "probable" and "reasonable" that had been used by defense counsel as follows:

> Q. So when you say that you believe that the injuries were more likely than not caused by vulvar intercourse, are you saying that there is only a 51 percent likelihood or more?
>
> A. No, I'm talking more in the realm of statistical probability, in the realm of 95 percent.

### Who was the perpetrator?

If the child had been sexually abused, as Dr. Giese indicated was his opinion, the next question, of course, was—who did it. In this connection, it became critical to determine the timeframe in which the girl might have contracted the disease and who had access to her during that period.

Dr. Yowell, who was the girl's examining physician at the hospital on January 20, testified on direct examination by the prosecutor that, in adults, "you wouldn't expect to see any symptoms for 2 to 10 days after contacting." When asked whether "the incubation period" was different for children, he responded, "I don't have any data to support a judgment on that."

On cross-examination, though, Dr. Yowell was less precise about the incubation period:

Q. Now, you also talked about a typical incubation period of 2 to 10 days; is that correct?

A. In adults.

Q. Now, based on your experience, that can be longer; is that correct?

A. That's correct.

Q. In your experience, you have seen it up to 60 days; is that correct?

A. That's correct.

Q. It's not unusual for it to be 30 to 60 days; is that correct, that's not the norm but about 20 percent?

A. I don't know if I can definitely put a figure on it.

Q. Certainly not unusual?

A. Not unremarkable [sic] to have longer incubation periods.

When trial counsel inquired on redirect about the frequency of delayed symptoms, Dr. Yowell testified that "longer than 10 days is—it's not a daily occurrence, I would say unusual but not unremarkable [sic]" and that "[m]ore than 60 days would be exceptional; very rare."

Dr. Giese also was asked to address this subject during his testimony:

The normal incubation time can be anywhere from as short a time [as] two days to as long a time as a couple of weeks before the child would develop signs of vaginitis. Children do not—virtually always develop signs of vaginal infection when this organism is inoculated into the vagina primarily the mucous membrane is so thin, they don't have the estrogen buildup of the lining so that they are relatively resistant. So vaginitis is a very common occurrence in children who have gonorrhea.

On examination by the judge, Dr. Giese clarified this opinion:

In general, for children it would be [abnormal to see an incubation period of 30 days], because in the adult, you have the situation where you can have asymptomatic infection, so that you really don't

know that they've got the infection; they, essentially, become carriers, they have an active infection but don't demonstrate clinical symptoms. In children, they usually show up with clinical symptoms of vaginitis when it is—gains entrance into the vaginal track. So, two days to two weeks would be probably fairly accurate for children, and more likely two days.

The significance of the evidence of the likely incubation period, as indicated earlier, is in answering the question of who had access to the child when she likely was infected. Dr. Giese's testimony is ample basis upon which reasonable factfinders could conclude that the victim had been abused somewhere between 2 days and 2 weeks prior to her exhibiting symptoms of vaginitis on January 20, and Dr. Yowell's testimony as a whole is not inconsistent with this conclusion.

In this light, defense evidence that, sometime in mid-November 1988, the boyfriend of appellant's mother-in-law had access to the child and was a person of somewhat questionable character becomes less relevant. The evidence of record is that, during January 1989, the only persons known to have had access to the child for any period of time alone was appellant on three occasions, his wife, and a babysitter—who testified that, during the 2 hours in which she once had cared for the girl, no one else was present.

### Conclusions

Although we have not attempted to set forth all of the evidence presented by the prosecution and the defense, the foregoing is a fair summary of the state of the evidence before the factfinder. "In resolving legal-sufficiency-[of-evidence] questions, this Court is bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Blocker*, 32 MJ 281, 284 (CMA 1991); *United States v. Hart*, 25 MJ 143 (CMA 1987), *cert. denied*, 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988). It is clear to us that there was "sufficient evidence

... from which a court-martial may find or infer beyond a reasonable doubt those facts required by law for conviction," *see United States v. Harper*, 22 MJ at 161—specifically, as to the controverted issues in this case, that appellant's stepdaughter had been sexually abused by penetration of her vagina with a penis and that appellant was the penetrator.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and CRAWFORD concur.

GIERKE, Judge (dissenting):

I agree with the majority's conclusion that the evidence, when construed in the light most favorable to the prosecution, is sufficient for a reasonable trier of fact to have concluded that the victim was sexually abused. I part company from the majority when they conclude that a reasonable trier of fact could also have found beyond a reasonable doubt that appellant was the abuser.

Appellant was a Marine with an impeccable reputation and military record, unlike the grandmother's boyfriend, acknowledged by the majority opinion to be "a person of ... questionable character." 34 MJ at 253. Appellant denied under oath that he abused the victim. The victim's mother, a prosecution witness, testified that on every occasion when the victim was left alone with appellant, the victim was sleeping peacefully when the mother left her and sleeping peacefully when the mother returned. The victim showed no signs of distress or physical pain after being left alone with appellant.

The victim's mother also testified that when the victim was left with the grandmother's boyfriend, she was sleeping peacefully when the mother returned. Either the mother was being less than completely truthful or there is yet another possible perpetrator.

The only evidence tending to identify appellant as the abuser is the evidence that both he and the victim had a generic type of gonorrhea which was not further identified. The grandmother's boyfriend, an equally probable suspect, was not tested for gonorrhea.

Commander (CDR) Yowell, the first medical doctor to examine the victim, testified that he "noted a copious discharge in the vaginal area ... and because of the unusual nature and the large amount of discharge, I obtained a gram stain...." CDR Yowell obtained a medical history from the mother. The mother told CDR Yowell that she had noticed the vaginal discharge 2 days before bringing her to the hospital. Neither CDR Yowell nor any other expert opined how long the victim had been infected when she was examined on January 20, but the clear import of CDR Yowell's testimony is that she had been infected for a significant time. A "copious discharge" is not consistent with the first onset of symptoms.

Without evidence showing how long the victim had been infected, the evidence regarding the incubation period for gonorrhea does not exclude the grandmother's boyfriend as an equally probable perpetrator. Narrowing the list of suspects down to two is not enough to prove guilt beyond a reasonable doubt. Accordingly, I dissent.