UNITED STATES, Appellee

v.

Guiseppe B. CAGE, Corporal, U.S. Marine Corps, Appellant.

No. 93–1379.

CMR No. 90–3148R.

U.S. Court of Appeals for the Armed Forces.

Argued Nov. 9, 1994.

Decided June 12, 1995.

For Appellant: *Lieutenant Alan D. Titus*, JAGC, USNR (argued).

For Appellee: *Lieutenant S.J. Coaty*, JAGC, USNR (argued); *Colonel T.G. Hess*, USMC, and *Lieutenant Scott A. Browne*, JAGC, USNR (on brief); *Colonel J. Composto*, USMC.

*Opinion of the Court*

GIERKE, Judge:

1. A military judge sitting as a general court-martial convicted appellant of rape and assault consummated by a battery, in violation of Articles 120 and 128, Uniform Code of Military Justice, 10 USC §§ 920 and 928, respectively. The assault consummated by a battery is unrelated to this appeal. Appellant also was charged with conspiracy to commit rape and dereliction of duty, in violation of Articles 81 and 92, UCMJ, 10 USC §§ 881 and 892, respectively. After both

sides had rested, the prosecution withdrew the conspiracy charge and the military judge granted a motion for a finding of not guilty of dereliction of duty.

2. The approved sentence provided for a dishonorable discharge, confinement for 8 years, and total forfeitures. The Court of Military Review[1] on May 13, 1993, set aside the conviction of rape and approved a conviction of indecent assault, in violation of Article 134, UCMJ, 10 USC § 934, as a lesser-included offense of rape. That court reassessed the sentence to a dishonorable discharge, confinement for 4 years, and total forfeitures. Unpub. op. at 2.

3. We granted review of the following issue:[2]

> WHETHER THE EVIDENCE OF RECORD IS LEGALLY SUFFICIENT TO SUPPORT THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW'S FINDING OF GUILTY TO THE LESSER INCLUDED OFFENSE OF INDECENT ASSAULT.

We hold that the evidence is not legally sufficient to support a conviction of indecent assault, so we reverse.

### Summary of the Evidence

4. Appellant was a Marine Corps recruiter. Nicole D was a 19–year–old potential enlistee in the Marine Corps. She was a person of limited intelligence, having twice failed the test for a driver's license and having failed the Air Force enlistment qualification test. In early August 1989, she was contacted by Sergeant (Sgt) Perez, another Marine Corps recruiter who worked with appellant. At some time before August 30, 1989, Sgt Perez took Nicole to appellant's apartment and introduced her to appellant, two other males, and appellant's girlfriend, "Mimi," later identified as Mary Torruella. Nicole stayed in the apartment for about 2 hours, after which Sgt Perez took her home.

5. On August 30, 1989, Sgt Perez contacted Nicole at her place of employment and told her that he needed to take her to Philadelphia for testing on that day. He instructed her to pack a bag for an overnight stay in Philadelphia, even though she lived only about 30 minutes' travel time from Philadelphia. Sgt Perez picked up Nicole at 11:00 a.m. in a "company" van, accompanied by appellant and another Marine, all in uniform. Nicole was wearing baggy white shorts and a tank top.

6. After leaving appellant and the other Marine at other locations along the way, Sgt Perez took Nicole to the recruiting office, where she spent "[a]t least two hours" filling out paperwork. Nicole had not eaten breakfast or lunch but was "okay."

7. At about 3:00 p.m., Sgt Perez and Nicole departed the recruiting office. She thought they were going "[t]o the testing site" in Philadelphia. Instead, Sgt Perez drove to a bar in Camden. Appellant was parked in front of the bar in another vehicle. All three went into the bar. Nicole testified that Sgt Perez told her "to follow them and they said—they told me to relax and I can trust them."

8. In the bar appellant asked Nicole if she wanted a drink, but she declined. Sgt Perez and appellant sat down and looked over Nicole's enlistment paperwork. After a few minutes, Sgt Perez departed for about 15 minutes, during which he changed clothes from his uniform to civilian clothes.

9. Nicole testified that when Sgt Perez returned to the bar, he asked her if she wanted a drink, and she said, "Yes." Sgt Perez then ordered an "Alabama slammer" for her and himself. Nicole testified that, even though she was a non-drinker and underage, she accepted the drink because "I was trying to prove that I was big—I could do whatever they could do.... Because they said I was a little girl ... [a]nd that I couldn't hang with them."

10. At about 5:15 p.m., appellant and Nicole departed the bar for the testing site in

---

1. See 41 MJ 213, 229 n. * (1994).

2. We also granted review of an issue regarding the independence of the Court of Military Review that has been resolved against appellant. See United States v. Mitchell, 39 MJ 131 (CMA), cert. denied, —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994).

Philadelphia. The test was supposed to start at 5:30. Sgt Perez remained at the bar.

11. Nicole testified that appellant drove to an unidentified hotel in Philadelphia, where they learned that the test was being conducted at the Military Enlistment Processing Station (MEPS). They drove to the MEPS and were informed that they had arrived too late to take the test.

12. Nicole testified that appellant said nothing about rescheduling the test. They drove back to the bar in Camden and told Sgt Perez what had happened. Nicole sat at the bar while appellant and Sgt Perez began playing pool. Nicole testified that she had not eaten anything all day and she asked appellant, "Could you take me to McDonald's or somewhere?" Appellant responded, "Right after I finish this game," but neither appellant nor Sgt Perez offered at any time thereafter to obtain any food for Nicole. She testified that she thought about asking again but "just left it alone." Instead, both Sgt Perez and appellant bought more "Alabama slammers" for Nicole. She testified that she consumed 5–8 drinks, after which her head "was spinning and it seemed like it got dark in the bar, like somebody just left one light on." After her last drink, she became ill and vomited at the bar.

13. Nicole testified that she did not remember leaving the bar, but that Sgt Perez later told her that he carried her out and put her in the van. She testified that she remembered being in the back of the van and heard appellant asking if she was "on the pill," promising her that "he won't come inside" her, and saying, "Nikki, I want you."

14. Nicole testified that she remembered appellant driving the van back to the bar, where Sgt Perez was standing outside waiting. Sgt Perez asked appellant, "Where have you been?" She remembered that one of them picked her up and moved her from the back of the van to the front seat. Then appellant got into his own vehicle, Sgt Perez got into the van with Nicole, and they all drove to appellant's apartment.

15. At the apartment appellant carried Nicole into the apartment, put her on the bed in a back bedroom, left the room, and closed the door. Nicole testified that while on the bed, she remembered appellant standing at the door of the bedroom and telling Sgt Perez, "Give me just five minutes." She did not hear what Sgt Perez was saying. She also remembered a female voice asking, "What are you two doing?"

16. Nicole testified that she remembered nothing else about her night in appellant's apartment. She remembered awakening and feeling "[o]verly tired," with her head "still spinning." She also felt "sore" "between her legs," felt a burning sensation when she urinated, and experienced some bleeding with a bowel movement. She could not remember if she was on top of the sheets or under the sheets.

17. When Nicole awakened, appellant was in the kitchen cooking breakfast. Nicole testified that she asked appellant what had happened, but "[h]e was quiet." Nicole ate some breakfast, took some aspirin, and drank some juice. Sgt Perez came to the apartment, and Nicole asked him what had happened the night before. He told her that she "was acting real wild in the bar" and that she "was flirting with him and coming on to him." Nicole testified that Sgt Perez' answer was untrue. Appellant and Sgt Perez departed for their office, and Nicole remained in the apartment watching television and then returning to the bedroom and going to sleep.

18. Nicole testified that Sgt Perez awakened her when he returned to the apartment and then told her, "Get your stuff together and I'm going to take you home." Sgt Perez drove her to her home in the van. He told her that if her mother asked about the enlistment test, "To tell her that I had failed the test, that I got the results back and I failed it."

19. Sgt Perez delivered Nicole to her home at about 2:00 p.m. Nicole called a friend, Lorna, and then "took a bath."

20. On cross-examination, Nicole testified that she had no recollection of appellant touching her or attempting vaginal or anal intercourse while they were in the van. Likewise, she had no recollection of anyone touching her or attempting vaginal or anal

intercourse while she was in the bedroom. She testified that when she awakened, all of her clothing was "in place," including her underwear and sanitary napkin. Even though she was still having her menstrual period, there was no blood on her white shorts or on the bed sheets. She had no scratches or bruises anywhere, including her vaginal and anal areas. A medical examination approximately a week and a half later revealed no sign of rectal or vaginal trauma.

21. Lorna S testified that Nicole called her and said that "she was calling because something had happened to her when she went to some kind of testing area that she had to do." Nicole was not crying but "was like, holding it back." She sounded "scared and confused." Nicole "said that she wasn't sure what had happened to her." Lorna told her, "You probably got raped," and Nicole responded, "Yes, I think I got raped." Lorna then told Nicole to tell her mother and to go to the hospital.

22. The defense rested without presenting any evidence. After the military judge granted a defense motion for a finding of not guilty as to Charge II and its specification (dereliction of duty by failing to properly dispatch an official vehicle), the prosecution withdrew the conspiracy charge (Charge I and its specification) and was granted permission to reopen its case and present the testimony of Sgt Perez.

23. Sgt Perez testified under a grant of immunity. He had been charged as a co-conspirator with appellant and a coactor in the rape of Nicole D. He had pleaded guilty at a general court-martial to several offenses, including sexual intercourse and indecent assault with four other female applicants for enlistment. His guilty pleas were pursuant to a pretrial agreement that limited his punishment, obligated the Government to withdraw charges of conspiring to rape Nicole D and raping Nicole D, and obligated him to testify against appellant.

24. Sgt Perez testified that Nicole D consumed "two to three" drinks at Pierre's bar on August 30. She was drinking "Tequila Sunrises." He testified that Nicole "sat at the table away from the bar" while he was shooting pool. Sgt Perez testified that appellant was "occupied with Mimi in the corner of the bar" for most of the time.

25. Sgt Perez testified they left the bar in a "convoy," with appellant in a government sedan, Mimi in her own vehicle, and Nicole with him in the van. He testified that en route to the apartment, Mimi's car turned off in another direction while appellant, Nicole, and he went to the apartment. On the way, Nicole "leaned, slipped" toward him. Sgt Perez "pushed her back up against the window of the van."

26. Sgt Perez testified that, after appellant put Nicole in the guest bedroom, he made some comments suggesting "an intimate relation of some sort" with Nicole. Sgt Perez "suggested not." Sgt Perez testified that he "just didn't feel right, you know—that it was right." Appellant responded, "Boss, five minutes," after which he went into the bedroom with Nicole. Sgt Perez did not see whether the door was open or closed.

27. After appellant had been in the bedroom for a few minutes, Sgt Perez heard the two of them go to the bathroom and then return to the bedroom. Appellant came out of the bedroom about 5 minutes later, went to the bathroom, and showered.

28. About a month later, appellant told Sgt Perez that he was "getting together some alibis about that evening." Appellant said he was gathering statements to establish that Nicole was not in the apartment on August 30.

29. Sgt Perez testified that Mimi was present in the apartment while Nicole was sleeping in the back bedroom. Mimi was living with appellant at the time.

30. Sgt Perez was not asked directly and did not say whether he spent any time in the bedroom with Nicole. He likewise was not asked and did not say whether he had any sexual contact with Nicole while he was alone with her in the van.

31. Mary Annette Torruella, known as "Mimi," testified that she was dating appellant and had moved into his apartment during the middle of August. She testified that on August 30, she left work about 4:30 p.m.

and walked across the street to Pierre's Bar to meet appellant. He told her to get something to eat and that he was taking Nicole to be tested. Appellant returned to Pierre's at about 6:10 p.m.; Nicole sat down at a table; and appellant talked with Sgt Perez for 10–15 minutes. They left Pierre's at about 6:30 p.m. Mimi testified that she and appellant left together in her vehicle; Sgt Perez and Nicole left in the van.

32. When they arrived at appellant's apartment, appellant told Mimi that Sgt Perez wanted to bring Nicole up to the apartment, and Mimi responded, "You must be fucking crazy." Mimi testified that because of her vehement objection, Nicole and Sgt Perez were never in the apartment on the night of August 30.

*Discussion*

33. The test for legal sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 MJ 324 (CMA 1987). We hold that the evidence in this case is not legally sufficient to uphold a conviction of indecent assault.

34. The basic factual question in this case is, "Who did what?" The evidence concerning the "who" is sparse. Sgt Perez was appellant's supervisor. He and appellant appear to have been equally involved in the scheme to keep Nicole away from home overnight and get her grossly intoxicated. Each had opportunities to be alone with Nicole while she was intoxicated, both in the van and in appellant's apartment. Sgt Perez was never asked if he assaulted Nicole, and he never expressly denied it; but he testified that he suggested to appellant that they not take advantage of Nicole. If Sgt Perez is believed, notwithstanding his ample motives to shift the blame to appellant, it may be inferred that he acted in conformity with his testimony that he "didn't feel right" about sexual contact with Nicole and therefore did not assault her. Viewing the evidence in the light most favorable to the prosecution and drawing all permissible inferences, it may be inferred that if anything was done to Nicole, appellant rather than Sgt Perez did it.

35. However, what happened cannot be determined on the basis of the evidence. The Court of Military Review found the evidence of rape factually insufficient. *See* Art. 66(c), UCMJ, 10 USC § 866(c). That decision is not reviewable. *See* Art. 67(c), UCMJ, 10 USC § 867(c) (1989). Therefore, the only question before us is whether there is evidence from which a rational factfinder could find that appellant committed the indecent assault found by the Court of Military Review, *i.e.,* "by touching the victim's vagina with his penis and/or hand." Unpub. op. at 2.

36. We do not believe that the evidence would permit a rational factfinder to make such a finding. Nicole herself did not know what had happened. She asked appellant and Sgt Perez what had happened during the night, and Sgt Perez told her that she had been "real wild" and "was flirting with him and coming on to him."

37. The possibility of a sexual assault was first suggested by Nicole's friend, Lorna, on the day after Nicole's drinking bout and overnight stay at appellant's apartment. When Nicole told Lorna that she wasn't sure what had happened, it was Lorna, not Nicole, who suggested that Nicole had been raped. This is of little or no evidentiary value as a "fresh complaint." *Cf.* ¶54(11) (Crawford, J., dissenting). It is nothing more than an allegation based on a suggestion planted by a friend.

38. Nicole's clothing, including her sanitary napkin, were in place on the following morning. There were no bloodstains on her clothing or on the bedsheets. The medical examination revealed no evidence of trauma. While Nicole's painful urination, bloody bowel movement, and general soreness between her legs are "consistent with" an indecent assault, they are also "consistent with" Nicole becoming intoxicated to the point of unconsciousness, vomiting repeatedly, being carried into the van, being passed from the back seat to the front seat of the van, nearly falling out of her seat in the van, and—as

described by trial counsel in closing argument—being "carried like a rag doll" up to appellant's apartment.

39. Even if Sgt Perez' testimony is given the benefit of every permissible inference, he did not and could not testify that appellant indecently touched Nicole in the bedroom. The only sound he heard was appellant going with Nicole to the bathroom. The most that his testimony can establish is that appellant may have helped a very drunk and very sick young woman into the bathroom.

40. While the evidence, construed in the light most favorable to the prosecution, would show that appellant expressed a desire for sexual contact with Nicole, there is no testimony and no physical evidence suggesting that he acted on that desire. To conclude that appellant sexually assaulted Nicole is pure speculation.

■ 41. Mere suspicion that something improper must have happened, with no direct or circumstantial evidence establishing what happened, is not sufficient. *See United States v. Peterson,* 1 USCMA 317, 320, 3 CMR 51, 54 (1952) ("[S]uspicion, conjecture, and speculation cannot form the basis for factfinding action."). *Cf. United States v. Jones,* 418 F.2d 818, 827 (8th Cir.1969) (conviction of "aiding and abetting . . . requires more than a bare suspicion that one participated in" the crime). The Court of Military Review's *de novo* review of the record left them uncertain about what had happened.

They set aside the rape conviction but then further reflected their uncertainty by affirming an indecent assault "with his penis and/or hand." We hold that the evidence is not legally sufficient even to justify that ambiguous finding.

42. Our holding does not condone the unprofessional and possibly illegal conduct of appellant and Sgt Perez. Whether appellant could have been charged and convicted of regulatory violations or dereliction of duty based on his improper conduct with a potential enlistee, or violations of local law by purchasing alcoholic beverages for a minor is not before us.

■ 43. While the motives of Sgt Perez and appellant may have been less than honorable, we are not convinced that the evidence is sufficient for reasonable factfinders to find beyond a reasonable doubt every essential element of the offense found by the court below—here, indecent assault. *See* para. 63b(1), Part IV, Manual for Courts-Martial, United States, 1984 ("That the accused *assaulted* a certain person not the spouse of the accused *in a certain manner.*" (Emphasis added.)); *see generally Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d 560.

44. Our holding might also be framed in terms of absence of establishment of a *corpus delicti* [3]—that is, a lack of substantial evidence that an indecent assault in fact oc-

3. We recognize that, in the more recent cases of this Court, the concept of *corpus delicti* has lost its importance as a predicate for admission of a confession. *Compare United States v. Maio,* 34 MJ 215, 218 (CMA) *cert. denied,* — U.S. —, 113 S.Ct. 196, 121 L.Ed.2d 138 (1992); *United States v. Rounds,* 30 MJ 76, 80–81(CMA), *cert. denied,* 498 U.S. 846, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Melvin,* 26 MJ 145 (CMA 1988); and *United States v. Yeoman,* 25 MJ 1, 4 (CMA 1987), *with United States v. Smith,* 13 USCMA 105, 32 CMR 105 (1962); *United States v. Mims,* 8 USCMA 316, 24 CMR 126 (1957); *United States v. Goodman,* 1 USCMA 170, 2 CMR 76 (1952). That has no bearing, however, on the continued need for the total body of the evidence to establish a *corpus delicti* as a matter going to the sufficiency of the evidence of guilt. *See United States v. Maio,* 34 MJ at 222, 223 (Cox, J., concurring) ("Obviously, there is a distinct difference between legal sufficiency of evidence and

admissibility."; "Admissibility is one thing; legal sufficiency is another. Had the case been tried on the merits and had no external evidence been presented corroborating the occurrence of a crime, the military judge should have granted a motion for a finding of not guilty at the close of the prosecution's case."). *See also United States v. Smith,* 13 USCMA at 113, 32 CMR at 113 ("In the trial of a criminal case in Federal civilian courts it is necessary that the *corpus delicti* be proved," and "the same is recognized by paragraph 44f(3), Manual for Courts-Martial, United States, 1951, which provides that: '... As to each offense charged, the burden is on the prosecution to prove beyond a reasonable doubt by competent evidence *that the offense was committed* ....' [Emphasis supplied.]"); *United States v. Mims,* 8 USCMA at 319, 24 CMR at 129 (Ferguson, J., concurring in the result) ("The test for proof of the *corpus delicti* is in the area of legal sufficiency....").

curred. *See United States v. Maio*, 34 MJ 215, 222 (CMA) (Cox, J., concurring), *cert. denied*, ‑‑‑ U.S. ‑‑‑, 113 S.Ct. 196, 121 L.Ed.2d 138 (1992). Accordingly, the conviction cannot stand.

*Decision*

The 1993 decision of the United States Navy–Marine Corps Court of Military Review as to Charge III and its specification and the sentence is reversed. The findings of guilty of the lesser-included offense of indecent assault are set aside and Charge III and its specification are dismissed. The record of trial is returned to the Judge Advocate General of the Navy for remand to the Court of Criminal Appeals, which may reassess the sentence or order a rehearing on sentence on the basis of Charge IV.

Judges COX and WISS, concur.

SULLIVAN, Chief Judge, dissenting:

45. *Black's Law Dictionary* 1399 (6th ed. 1990) defines *speculation* as "the art of theorizing about a matter to which evidence is not sufficient for certain knowledge." On the other hand, it defines *circumstantial evidence, inter alia*, as the "[p]rocess of decision by which court or jury may reason from circumstances known or proved, to establish by inference the principal fact." *Id.* at 243. Regardless of the proper demarcation between the two, I disagree with the majority that there was insufficient evidence in this case to infer beyond a reasonable doubt that appellant committed an *indecent assault* on Nicole D. *See generally Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

46. The majority opinion cites the evidence introduced in this case and concludes that it is not legally sufficient to justify a finding of guilty to indecent assault. In reversing the factual decision of the trial factfinder as well as a respected appellate court with factfinding powers, the majority concedes that the evidence in this case was "consistent" with indecent assault by a third person. Yet, it concludes that the evidence might also be "consistent" with the victim's own drunken semi-conscious stumblings on the evening in question. ¶ 38. I note, however, that it is well established that consistency of the evidence presented at trial with some theory of innocence does not preclude upholding a conviction on appeal. *See United States v. Blocker*, 32 MJ 281, 285 (CMA 1991).* Here, clear and sufficient circumstantial evidence supports the Court of Military Review's findings of guilty to the lesser-included offense of indecent assault, and that is all which is required. *United States v. Hart*, 25 MJ 143, 147 (CMA 1987), *cert. denied*, 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988); *Hilton v. State*, 659 S.W.2d 154, 157 (Tex.App. 2 Dist.1983). *See also United States v. Williams*, 34 MJ 250, 251–52 (CMA), *cert. denied*, ‑‑‑ U.S. ‑‑‑, 113 S.Ct. 379, 121 L.Ed.2d 289 (1992).

47. The majority more particularly opines that, "[w]hile the evidence, construed in the light most favorable to the prosecution, would show that appellant expressed a desire for sexual contact with Nicole, there is no testimony and no physical evidence suggesting that he acted on that desire." ¶ 40. I disagree with this reading of the record.

48. The evidence of Nicole's physical condition is uncontroverted. The victim testified

---

* The Court of Appeals for the First Circuit made this point clear in *United States v. Laboy*, 909 F.2d 581, 588 (1990):

> In examining claims of insufficient evidence, this court must review the evidence considered as a whole, including all inferences that may be reasonably drawn therefrom in the light most favorable to the government, and decide if any rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Santiago*, 828 F.2d 866, 870 (1st Cir.1987); *United States*

> *v. Samalot Perez*, 767 F.2d 1, 4 (1st Cir.1985). *Nor is it required that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt. United States v. Santiago*, 828 F.2d at 870; *United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir.1987); *United States v. Rivera Rodriguez*, 808 F.2d 886, 890 (1st Cir.1986). As long as the record as a whole supports the conclusion of guilt beyond a reasonable doubt, the jury is free to choose among reasonable constructions of evidence. *Id.*

(Emphasis added.)

as to the condition of her body after her encounter with appellant and his drunken enlistment processing spree. She stated:

Q. What's the next thing that you remember?

A. Waking up in the morning.

Q. Waking up in the morning?

A. Yes.

Q. When you woke up were you on top of the sheets or were you under the sheets; do you remember?

A. I don't know. I'm not sure.

Q. How did you feel when you woke up the next morning?

A. Overly tired. My head was still spinning and sore.

Q. Where were you sore, Nikki?

A. In between my legs.

Q. In your private area?

A. Yes.

Q. How sore were you?

A. Ah—

Q. Was it a little bit sore, medium amount of sore or real sore?

A. It was sore, it was real sore.

Q. Now, you mentioned before that you were on the last day of your period that day, right?

A. Yes.

Q. Now, was this soreness that you felt, was it the type of soreness that you might feel with your period?

A. No.

Q. Did you use the bathroom at all that morning?

A. Yes.

Q. Did you feel any particular—or different sensation when you went to the bathroom?

A. Yes.

Q. What did you feel?

A. I went to urinate and it burned.

Q. Had it been burning earlier, the day before?

A. No.

Q. Or the day before that?

A. No.

Q. Does it ever burn when you urinate when you have your period?

A. No.

Q. Was either Corporal Cage or Sergeant Perez in the apartment when you woke up the next morning, when you first woke up?

A. Yes.

Q. Which one?

A. Corporal Cage.

Q. How about Sergeant Perez?

A. No.

49. Clearly, this was some evidence concerning the victim's physical condition from which it could be inferred that her private parts were at least touched. *See generally United States v. Williams, supra* (evidence of victim contracting gonorrhea). In addition, as conceded by the majority (¶ 40), there was other evidence of a motive and intent on appellant's part to engage in sexual acts with the victim in this case (*i.e.,* appellant's words to the victim about being "on the pill" and "Nikki, I want you" and his words to Sgt Perez, "Give me just five minutes"). Finally, there was evidence that appellant had ample opportunity to commit an indecent assault on the victim during the periods in which she was under his exclusive control in his apartment. *See Hilton v. State,* 659 S.W.2d 154.

50. I realize that this case would have been much easier to sustain if the physical pain in her vaginal area had caused this school girl to awake during the sexual assault upon her. *See People v. McCoy,* 156 Ill. App.3d 194, 108 Ill.Dec. 871, 875, 509 N.E.2d 567, 571 (1 Dist.1987); *State v. Reuer,* 396 N.W.2d 668 (Minn.App.1986). However, appellant should not be given immunity for his conduct or clemency simply because he was successful in rendering his victim unconscious through drink. Moreover, the majority's tortured reading of this record to find that *perhaps* Nicole's physical injuries were caused by her drinking and not his lust is simply irrelevant. *See generally United States v. Ortiz,* 23 F.3d 21, 24–25 (1st Cir. 1994). In sum, appellant's conviction for indecent assault was not based on "pure speculation" (¶ 40) but on rational analysis of the evidence of record by properly authorized factfinders.

51. To summarize, the majority is facing an uphill road in its reversal of this case. Case law, in particular, makes the majority's journey a steep one, when as here a trial factfinder (the military judge) convicts on certain evidence and a special appeals court with powerful factfinding powers (the Navy–Marine Corps Court of Military Review) has found that the evidence in the record support the conviction. I have no doubt that the judges in the majority have the best intentions in doing their duty as they see it in this case. To me, however, it is clear that they have inadvertently fallen into a common trap for appellate judges in close factual cases— they are viewing the evidence through the very human eyes of a juror rather than from the case-law-restricted gaze of an appellate judge. If the majority were driving a car on the road to justice in this case, I am certain it would crash into the stonewall of *Jackson v. Virginia, supra.*

CRAWFORD, Judge, dissenting:

52. Appellant was tried by a military judge alone for rape, assault and battery, as well as conspiracy and dereliction of duty. He was found guilty of rape and assault and battery. The prosecution withdrew the conspiracy charge relating to the rape, and the judge sustained the motion for a finding of not guilty of dereliction of duty concerning improper use of a government vehicle. The Court of Military Review[1] set aside the rape conviction and approved a conviction for indecent assault with a significant sentence reduction.

53. The standard of review is whether, "viewing the evidence in the light most favorable to the prosecution," any reasonable factfinder "could have found the essential elements of" indecent assault beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In applying the *Jackson* standard we must look at the actions of appellant and Sergeant (Sgt) Perez who were working out of the same recruiting office. While one piece of evidence may in isolation raise unresolved questions, when the actions of both appellant and Perez are taken together, as they must be, it is clear that they were acting in furtherance of a conspiracy. Further, the evidence is more than sufficient to support appellant's conviction for indecent assault under the *Jackson* standard. I fear, like Chief Judge Sullivan, that the impact of the majority decision is seriously to erode the *Jackson* standard; therefore, I dissent from that opinion.

54. Whether the Government has met its burden of proof[2] depends on reasonable answers to the following "why" questions raised by the facts of this case:

(1) Why ask a potential recruit to pack an overnight bag for a 30–minute ride?

(2) Why take a minor to a bar and buy alcoholic beverages for her before her examination?

(3) Why take a recruit to an exam at 5:30 p.m., knowing that most offices are closed at that time?

(4) Why take the recruit back to the bar and challenge her to drink more alcoholic beverages?

(5) Why take the recruit to appellant's house rather than a hotel, as they had earlier told her they would do?

(6) Why ask if the recruit is on the pill?

(7) Why state, "don't worry I won't ejaculate in you"?

(8) Why ask for 5 more minutes alone in the bedroom with the recruit?

(9) Why would the recruit, who was nearly unconscious the night before, wake up in the morning with an extremely sore genital area and experience a burning sensation when she urinated?

1. See 41 MJ 213, 229 n. * (1994).

2. The last Manual to use the term *corpus delicti* was Manual for Courts–Martial, U.S. Army, 1949. *See* ¶ 127a. The majority is right. The concept goes to the question of proof and normally is concerned with reducing the possibility of punishing a person who did not commit a crime. *See, e.g., State v. Lucas,* 30 N.J. 37, 53–63, 152 A.2d 50, 58–63 (1959). Even the majority recognizes "the motives" of appellant and his uncharged co-conspirator were "less than honorable." ¶ 43.

(10) Why would the recruit wake up in the morning with an extremely sore anus and experience a bloody bowel movement?

(11) Why would the recruit make a fresh complaint that she had been *raped*? [3]

(12) Why, if nothing happened, would appellant arrange to set up an alibi?

(13) Why, if nothing happened, would appellant pay a witness to provide an alibi?

55. This is a case of appellant, a corporal and Marine Corps recruiter, along with his consort and fellow recruiter, Sgt Perez, preying upon a young woman of limited intelligence to satisfy their sexual desires. They plied her with alcohol and denied her food, resulting in intoxication so severe that the young woman drifted into and out of consciousness. This was not the first time that appellant and Perez sought to use this same ploy. They had also called another woman and asked her if she was interested in the Marine Corps. She was. However, she refused to pack an overnight bag and accompany them for the evening. She declined their offer to put her up in a hotel in order for her to be closer to the site of the physical examination early in the morning. Since it was only a 30–minute ride to the examination site, she told them that she preferred to stay at home. But here N, the alleged victim, succumbed to appellant's devious offer and agreed to pack an overnight bag for what was essentially a 30–minute ride. However, rather than going directly to Philadelphia for the examination, appellant and Perez first took N to the recruiting office to fill out paper work and then to a bar where they proceeded to challenge her to drink a number of "Alabama Slammers." Thereafter, they took her to the examination site at 5:30 p.m., knowing most government offices are not open at that time.

56. After finding the testing site closed, they drove one-half hour to Camden, New Jersey. Riding back to the bar, appellant asked about sexual intercourse and asked N if she was on the pill. He told N in the van "that he won't come inside" her. At the bar appellant and Perez again began plying N with alcoholic drinks, including mixed drinks. They declined to give her any food when she asked for it. N testified that she drank approximately five to eight drinks during the evening and became sick.

57. N was so intoxicated she does not remember being carried out by Perez and being placed in the van. She was not taken to a hotel but driven to appellant's apartment. Appellant carried N into his apartment and put her in a bed in the back room. She heard appellant's voice outside the bedroom saying to Perez, "Give me just five minutes." The two men's conversation was broken by a woman's voice. When N woke up in the morning, her genital area was very sore. She experienced a burning sensation when she urinated, a condition she did not have previously. She also had an extremely sore anus and a bloody bowel movement. The majority apparently attaches significance to the fact that her "clothing, including her sanitary napkin, were in place on the following morning" and that "[t]here were no bloodstains on her clothing or on the bed sheets." ¶ 38. Obviously clothing, including panties with a sanitary napkin, can be moved or removed from and then put back on a person. The lack of blood is only indicative of the fact that N did not menstruate during that night. This would not be unusual considering that the evidence was uncontested that the day of the incident was near the end of her menstrual cycle.

---

3. Contrary to the majority's view, I would not discount the importance of N's call to Detective Anderson the day after the event. It is uncontested that N was suffering from genital and anal discomfort and that she was puzzled about the cause of that discomfort. The suggestion by N's friend of the possibility of a sexual assault is certainly an eminently reasonable conclusion based upon the circumstances. I would suggest that familiarity with female anatomy would lead any reasonable person like N's friend to conclude that N's symptoms were much more likely to have been caused by anal penetration and genital fondling with appellant's "penis and/or his hand" than by an overindulgence in alcohol as suggested by the majority. Accordingly, I strongly disagree with the majority's implication that the suggestion of sexual assault by N's friend is somehow an unreliable "plant" serving to undermine N's fresh complaint. *Cf.* ¶ 37. Quite the contrary, it is perhaps the most logical and reasonable explanation for N's symptoms.

58. While appellant was cooking breakfast, N asked him what happened. He did not answer. When Perez arrived that morning, N asked him what happened. He said she had become "wild in the bar" and began "flirting." She denied this. Perez and appellant left and went to their office. When they returned, they took N home at 2:00 p.m. After she arrived home, she called a friend and described what happened including her physical symptoms. Her friend suggested that she might have been raped. She was too afraid to tell her mother.

59. Perez testified under a grant of immunity that after depositing N in bed, appellant asked Perez if he wanted to "spend some time" with N. Perez concluded that appellant was offering her services for "intimate" relations. Perez declined the offer. Appellant then asked for 5 minutes with her. Perez left appellant alone with N in the bedroom. After being in the bedroom alone with N for about 5 minutes, appellant emerged, went into the bathroom, and took a shower.

60. On September 10, 1989, when faced with the allegation of rape, appellant showed his consciousness of guilt when he told Perez that he was planning to arrange for some witness to say that N was not at his apartment on the evening of August 30. The alibi that appellant had set up and introduced at trial fell apart when the alibi witness was clearly impeached. Additionally, evidence was introduced that N had a good reputation for truthfulness, while appellant's credibility was called into question.

61. The majority concludes that "the evidence is not legally sufficient even to justify ... [the Court of Military Review's] ambiguous finding" that appellant indecently assaulted N "with his penis and/or his hand." ¶ 41. I submit that N's complaints of a sore genital area; a burning sensation while urinating; a sore anus and a bloody bowel movement constitute non-ambiguous physical evidence entirely consistent with an indecent assault by appellant "with his penis and/or his hand." I also agree with Chief Judge Sullivan that "clear and sufficient circumstantial evidence supports the Court of Military Review's findings of guilty to the lesser-included offense of indecent assault." ¶ 46.

62. In summary, I am convinced that the evidence adduced at trial is more than sufficient to support a finding that appellant committed an indecent assault upon N. Two factfinders have so held. I would not disturb their findings.