UNITED STATES, Appellee,

v.

Lawrence E. SEVER, Staff Sergeant
U.S. Army, Appellant.

No. 68471.

CMR No. 9102838.

U.S. Court of Military Appeals.

Argued Oct. 7, 1993.

Decided Jan. 12, 1994.

For Appellant: *Captain Paul H. Turney* (argued); *Colonel Malcolm H. Squires, Jr., Lieutenant Colonel James H. Weise, Captain Robert L. Carey* (on brief); *Captain Robin N. Swope.*

For Appellee: *Captain Kenneth G. Wilson* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Captain Robert J. Walters* (on brief); *Major Joseph C. Swetnam.*

*Opinion of the Court*

CRAWFORD, Judge:

Appellant was tried by a military judge alone at a general court-martial in Germany and was convicted, in accordance with his pleas, of one specification each of committing indecent acts upon a child and of assault and battery upon a child, in violation of Articles 134 and 128, Uniform Code of Military Justice, 10 USC §§ 934 and 928, respectively. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for 4 years and reduction to the lowest enlisted grade. The court below affirmed the findings and sentence, and this Court ordered briefs on this specified issue:

> WHETHER THE PLEAS OF GUILTY TO CHARGE III AND ITS SPECIFICATION (ASSAULT UPON A CHILD BY KISSING HER ON THE CHEEK) WERE PROVIDENT.

FACTS

Charge III and its specification alleged, and SSG Sever pleaded guilty to, assaulting a child under the age of 16 years by unlawfully kissing her cheek. During the ensuing providence inquiry, the military judge explained the elements of the offense and obtained SSG

Sever's admission that those elements properly described his actions.

In his explanation of the elements of the offense, the military judge defined "battery" as "an unlawful and intentional application of force or violence to another" and "bodily harm" as an "offensive touching of another person, however slight." Upon SSG Sever's request for clarification, the following colloquy ensued:

MJ: Okay. When I'm talking about bodily harm, you know, the assault must result in a touching of the person—

ACC: That's—

MJ:—physical contact in other words.

ACC: All right, sir.

MJ: And normally it would mean any physical injury, however slight, you know, if it's just a bruise or just a scratch or anything of that nature, very minor, superficial; or offensive touching of another person, however slight. And the offensive touching in this case would be the kissing aspect of it.

ACC: On the cheek without her consent, yes, you're right.

MJ: Right.

ACC: I do understand that.

MJ: Now, it would not necessarily be an offensive touching, but that's a question of fact which I will have to determine when I talk with you. I mean, if it's a simple greeting that would normally be exchanged between an adult and a child and it's done in the normal course of greeting somebody, that may not be an offensive touching. But it depends on the facts and circumstances whether it's going to be offensive. Do you understand that as well?

ACC: Yes, sir.

Next, the military judge reviewed a stipulation of fact with the appellant and explained: "When you stipulate the court may accept as true the facts in the stipulation without receiving further evidence from either side." The military judge also advised appellant that he had "an absolute right not to stipulate" and that the stipulation would only be used with his "free and voluntary consent." Appellant indicated that he understood. The pertinent portions of the stipulation provide:

3. Staff Sergeant Sever, his wife Mary Ellen, and their children PCS'ed to Munich in November 1990. The Severs have a ten year old daughter, [M], who was then nine years old and in the fourth grade. [M] met a girl in her class at school who lived in an adjacent building and they became friends. The girl was the victim, [D]. At the time of the crimes described in this stipulation of fact, [D] was nine years old, about four feet, five inches tall and weighed about eighty five pounds.

4. [D] and [M] began spending nights at each other's houses. [D] spend the night at the Sever house two or three times without incident. During January 1991, on a weekend night, [D] was spending the night with [M]. The two girls were sleeping in [M]'s room which has two single beds pushed together. Both of them were in bed, with [M] sleeping next to the door and [D] sleeping next to the only window. Around three o'clock in the morning the door opened. [D] woke up and saw SSG Sever come in the door. She knew it was the accused because the hallway light was on and she could see his face as he entered. She pretended to be asleep because she thought she might get in trouble for being awake so late. SSG Sever was wearing a bathrobe and pajamas. SSG Sever walked around the bed to [D]'s side and pulled the covers and the sheet back.

5. [D] was wearing a nightgown and panties. SSG Sever lifted her nightgown up to expose her breasts and pulled her panties off to expose her genitals. He rubbed his hand over her breasts and down over her stomach, and rubbed her vagina and the surrounding area as well as her upper thighs. He then knelt down and licked her breasts and moved down her body and licked her genital area. In relating her story to the school nurse, Ms. Fitzgerald, the CID and to the Article 32 Investigating Officer, [D] stated that the accused then stood up, parted his robe, exposed his erect penis, and placed [D]'s hand on his penis. He held his hand over hers and rocked his hips back and forth to

create a stroking motion. Within a few minutes he ejaculated onto [D]'s hand and wiped the semen on her hand onto his robe. [D] referred to the semen as "gooshy stuff." He closed his robe and left the room without saying anything to [D].

6. [D] was terrified and said nothing at that time. She remained awake and frightened all night and asked [M] in the morning whether she had heard anything. She said nothing to her mother because she was ashamed and afraid she had done something wrong.

7. During February 1991, [M] had a birthday and slumber party. The party was held in the playroom above the Severs' quarters. [D] and several other girls were invited. After the party [D] and another girl spent the night in the Severs' living room. At about three o'clock in the morning, SSG Sever came into the living room dressed in his BDU's. He walked over to the couch where [D] was sleeping. [D], who wakes up easily, heard SSG Sever come in and sat up on the couch. The accused approached [D] and asked her something she understood as: "Can I nibble on your neck?" She told him no, that she didn't like that. The accused, without her permission, against her wishes, and with unlawful force kissed her on the cheek twice. [D] reminded him that he had to go to work and that he should leave so he wouldn't be late. She said this to avoid any further offensive touching by the accused. The accused then left for work.

After reviewing the Stipulation of Fact, the judge had SSG Sever explain his version of the offenses. After reiterating the facts concerning the indecent acts he committed upon [D] in January, appellant explained his version of the facts concerning his indecent assault upon [D] in February:

ACC: My daughter had a slumber party for approximately 10 people, sir. During the night—I went to bed early, sir. Understand, during the time I knew what had happened previous. I was not, you know, I was not totally heartless to the offense; I knew the girl was concerned and upset. For some reason she and another girl came down, and she slept on the couch and the other girl slept on the floor in the living room in our apartment, rather than the others who all stayed upstairs and slept in a huge playroom. I had guard duty the next day, and got up early in the morning to do that and was in full gear. As I came out, I thought she was crying because she sprang up. I thought she had been crying, and I asked her, "Did you have a nightmare?" I think she understood me to say, "Can I nibble on your neck?"

MJ: Okay.

ACC: Because she obviously was afraid of me, sir.

MJ: All right.

ACC: And she said, "No, I don't like that," and it made no sense to me. I put my hand on her head and bent over and kissed her on the cheek. She states I kissed her on the cheek twice. That may indeed be true. Again, I don't remember the specific—I don't remember the whole incident. I remember the specifics as kissing her on the cheek or possibly forehead and telling her, "Everything's going to be all right. Don't worry." I wanted to tell her I was sorry but I didn't have the words, sir.

MJ: Okay. Well, what made you think that—why were you telling her this if you thought she was asleep the first time?

ACC: I was aware of my own actions, sir. I know that I'd done wrong and figured she was probably aware, too, especially with her tensing. Again, that scared me.

MJ: Right.

ACC: I was pretty much aware that she has known something had happened [earlier].

MJ: Well, when you kissed her, are you satisfied—or what convinces you that this was an offensive touching if you were just trying to console her?

ACC: Sir, although I was trying to console her, I can easily see if her mind that it was an offense because I was her perpetrator. Having been guilty of something once, I'm sure she was scared to death and considered that most offensive.

MJ: And you were satisfied at the time that she was not consenting to your kissing her on the cheek?

ACC: Yes, sir.

## DISCUSSION

We must resolve the narrow question whether the "record of trial shows a 'substantial basis' in law and fact for questioning" appellant's guilty pleas to assault upon a child by kissing her on the cheek. *United States v. Prater*, 32 MJ 433 (CMA 1991).

Appellant asserts that his plea to Charge III and its specification were improvident because the providence inquiry did not establish the requisite element that his two kisses were accomplished by unlawful force or violence. Instead, appellant argues the providence inquiry indicates to the contrary—that the kissing was justified as a consoling and reassuring gesture because appellant thought [D] had a nightmare.

" 'Bodily harm' means any offensive touching of another, however slight." Para. 54c(1)(a), Part IV, Manual for Courts–Martial, United States, 1984. Kissing, even though it generally only implies a minimum use of force, is sufficient for the offense. *See People v. James*, 9 Cal.App.2d 162, 48 P.2d 1011, 1012 (1935) (It is a battery for a man to kiss a woman against her will.). Not every kiss is an offensive touching, however, and proof that a kiss was rendered under circumstances indicating a legal justification or excuse may disprove the requisite use of unlawful force or violence.

In this case, appellant had a special responsibility to the care, discipline, and safety of the young girls sleeping over night at his house as part of his young daughter's birthday party. *See* W. LaFave & A. Scott, *Substantive Criminal Law* § 5.6 at 644 (1986). Under such circumstances, an innocent parent might normally be free to kiss a child under his or her protection to calm it after a nightmare, without fear of prosecution. The present case is not one of an innocent parent.

Appellant admitted during the providence inquiry that [D] was obviously afraid of him and that, before he kissed her, she said something to the effect of, "No, I don't like that." Appellant also admitted he knew, based on the indecent acts he had performed on [D] the previous occasion that she spent the night under his care, that [D] "was scared to death and considered that [the kissing] most offensive."

Under these circumstances, we hold that the record of trial does not show a "substantial basis" in law and fact for questioning appellant's guilty plea to assault upon a child by kissing her on the cheek.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, GIERKE, and WISS concur.