**UNITED STATES, Appellee**

v.

**Andrew J. HOGGARD, Jr., Staff Sergeant U.S. Army, Appellant.**

No. 94–0535.
CMR No. 9201632.

U.S. Court of Appeals for the Armed Forces.

Argued March 8, 1995.

Decided Sept. 26, 1995.

For Appellant: *Captain Richard E. Burns* (argued); *Colonel Stephen D. Smith, Major Fran W. Walterhouse, Captain Teresa L. Norris* (on brief); *Lieutenant Colonel James H. Weise.*

For Appellee: *Captain J. Key Schoen* (argued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl, Captain Anthony P. Nicastro* (on brief); *Captain Louis E. Peraertz.*

**2**

COX, Judge:

1. Appellant was convicted, contrary to his pleas, of rape, adultery and indecent assault (3 specifications), in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. The general court-martial composed of officers and enlisted members sentenced him to a dishonorable discharge, confinement for 12 years, total forfeitures, and reduction to E–1. The convening authority approved the sentence as adjudged, and the Court of Military Review * affirmed. We granted review of the following issue:

WHETHER THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT THE FINDING OF GUILT BEYOND A REASONABLE DOUBT ON SPECIFICATION 3 OF CHARGE II (INDECENT ASSAULT).

2. Appellant, a married man, was a noncommissioned officer assigned to the U.S. Army Recruiting Co. Newburg, Stewart Army Subpost, New Windsor, New York. On August 4, 1991, he raped a military dependent, the wife of a servicemember who was overseas on military assignment.

3. The investigation that ensued uncovered at least three other women who alleged that appellant perpetrated varying degrees of sexual touching of them in the past. Each of these incidents was alleged as an "indecent assault" (Art. 134). None of the assaults, evidently, were memorialized at the time of occurrence, as each of the women could only estimate the time frame of the touching. Based on their statements, one groping was alleged to have occurred "sometime between on or about 13 June 1991 and on or about 26 June 1991." Another was alleged to have occurred "sometime between on or about 1 May 1991 and 30 June 1991."

4. The granted issue involves an incident alleged to have occurred "sometime between on or about 25 December 1990 and on or about 3 March 1991." Unlike the other two assaults, which unmistakably involved crass sexual touchings, the granted issue involves

what can only be described as an attempted kiss.

5. As the victim, Sergeant (SGT) MTB described the setting:

I was coming up the hill on post, and was being sort of tail-gated by the defendant, and I pulled into the NCO [Non-Commissioned Officers] Club's parking lot to see, whether—you know, if he was just tail-gating or what the deal was, and he pulled in the parking lot behind me.

6. In the parking lot, appellant pulled up beside her, at which point she recognized him. She did not work in the same section as appellant, but she had seen him before. He was "an acquaintance," not a friend. The incident occurred about "[d]usk, 4:30, 5 o'clock." SGT B got out of her car "to see what he wanted." It was cold and overcast outside, and appellant "invited" SGT B "to sit in his car"; she did. A "casual" conversation ensued (the substance of which SGT B did not recall at the time of trial), but she could recall that nothing "unusual" or offensive was uttered by appellant.

7. During the conversation, however, as SGT B described it:

We—I remember that we were talking, and somehow or another—like I said, I don't remember the exact conversation, but he had reached over, and then grabbed my shoulder, like trying to make a pass.

According to SGT B, appellant grabbed her right shoulder with his left hand, and it appeared he was trying to "kiss" her. His face got to "within a foot" of hers, when she "pulled back and got out of the car." He "did not pursue" her, and there was no other physical contact.

8. Approximately a month later, on at least one occasion, appellant showed up uninvited at SGT B's quarters at around 6:45–7:00 a.m., after she "returned from PT" (physical training). On such occasion, she "invited him in," but she was on her way out and let him know he had to leave. SGT B did not regard appellant as "a threat," so she did not report him to the chain of command.

* *See* 41 MJ 213, 229 n.* (1994).

9. Appellant's description of the episode was similar. He acknowledged driving up behind SGT B on the road and flashing his headlights to pull her over. He also conceded that, in the car, he "touched her on the shoulder" and that "she drew back." He disputed that he got his face as close as a foot to her face, but put the distance at more like "18 maybe to 20 inches." He denied an intent to do anything immoral or against SGT B's will. He testified, however:

> I was flirting with her and I reached over to put my arm around her to see what the possibilities may be, and when I put my arm around her she relaxed back so I just—okay.

10. Upon the foregoing information, the members convicted appellant of indecent assault.

11. Manual for Courts Martial, United States, 1969 (Revised edition), listed the offense of "indecent assault" under Article 134. The elements were set out as follows:

> (a) That the accused assaulted a certain female not his wife *by taking indecent, lewd, or lascivious liberties* with her person;
>
> (b) that the acts were done *with intent to gratify the lust or sexual desires of the accused;* and
>
> (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 213*f*(2) (emphasis added). In other words, the offense then required *both* an act which itself was indecent, etc., under the circumstances, *and* a prurient state of mind on the part of the perpetrator.

12. Manual for Courts–Martial, United States, 1984, however, seems to have split this offense into two separate offenses. What is now designated "Assault—indecent" (the offense at issue here) contains these elements:

> (1) That the accused *assaulted* a certain person not the spouse of the accused in a certain manner;

> (2) That the acts were done *with the intent to gratify the lust or sexual desires of the accused;* and
>
> (3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 63b, Part IV (emphasis added).

13. The incorporated elements of assault (Art. 128, UCMJ, 10 USC § 928) are:

> (a) That the accused *attempted or offered to do bodily harm* to a certain person; and
>
> (b) That the attempt or offer was done with unlawful force or violence.

Para. 54b(1), Part IV, 1984 Manual, *supra* (emphasis added). "Bodily harm" is further defined as "any offensive touching of another, however slight." Para. 54c(1)(a).

14. Thus, notwithstanding the misleading denomination, there appears to be no requirement in "assault—indecent" that the touching offered, attempted, or accomplished be "indecent." Indeed, "assault—indecent" is merely a simple assault committed by one with a prurient state of mind.

15. The other half of the former indecent assault offense now reposes in paragraph 90, Part IV, 1984 Manual, *supra* ("Indecent acts with another"). The elements of that offense are:

> (1) That the accused committed a certain wrongful act with a certain person;
>
> (2) *That the act was indecent;* and
>
> (3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 90b (emphasis added).

"Indecent" is defined as

> that form of immorality relating to sexual impurity which is not only grossly vulgar, obscene, and repugnant to common propriety, but tends to excite lust and deprave the morals with respect to sexual relations.

Para. 90c.

16. In other words, the offense of committing indecent acts with another relates to the indecency of the acts themselves. There

is no prosecutorial requirement to establish that the accused entertained any sort of prurient state of mind at the time.

17.   In the instant case, the Government alleged that appellant

commit[ted] an indecent assault on SGT ... [B], a person not his wife, by grabbing her right shoulder with his left hand and attempting to kiss her, *with intent to gratify his lust or sexual desires.*

(Emphasis added.)   With regard to this specification, the military judge instructed the members on the offense of "indecent assault" and the lesser-included offense of "assault consummated by a battery" (offensive touching).

18.   The initial question before us is whether the evidence of appellant's grabbing SGT B by the shoulder and attempting to kiss her is sufficient as a matter of law to constitute an "assault—indecent."   We conclude that it is not.   The test for determining legal sufficiency of evidence is whether, when viewed "in the light most favorable to the" Government, it is such that a "rational trier of fact could have found the essential elements of the" offense "beyond a reasonable doubt."   *Jackson v. Virginia* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Harper,* 22 MJ 157, 161 (CMA 1986).

19.   The key question here is—what evidence proves that appellant's attempt to kiss SGT B was done *with the intent to gratify his lust or sexual desires?*   We do not understand that every attempted kiss, or even every intended kiss with romantic overtones, establishes an intent to gratify lust or sexual desires.   What evidence here, then, is sufficient to establish that this attempted kiss had such an intent?   Surely appellant's conduct 3–6 months later with other women in other circumstances does not relate back and illuminate appellant's state of mind at the time he attempted to kiss SGT B.   If that were logically probative, then a rape victim's sexual practices at other times with other men would also logically relate to whether she consented to the sexual advances of her alleged rapist.   *But see* Mil. R.Evid. 412, 1984 Manual, *supra.*

20.   Certainly we understand that some kisses, and even some attempted kisses, may, in the circumstances of the conduct, be sufficient to suggest such a state of mind.   But in the absence of an admission of such a state of mind by appellant, nothing in the uncontested facts of this case went far enough to establish such an intent.   Indeed, it is abundantly clear that it was pure speculation, generated by spill-over from the other, later charges, that led the court members to find this element.   As a matter of law, we hold that the evidence of record is insufficient for a rational factfinder to conclude that appellant's attempt to kiss SGT B was done with the intent to gratify his lust or sexual desires.

21.   In view of appellant's conviction of rape and the other two blatantly indecent assaults, we are satisfied that appellant was not prejudiced as to sentence by this error.

The decision of the United States Army Court of Military Review is reversed as to specification 3 of Charge II. The finding of guilty thereon is set aside and specification 3 is dismissed.   In all other respects the decision below is affirmed.

Judges GIERKE and WISS concur.

CRAWFORD, Judge (dissenting in part and concurring in the result in part):

22.   Without more, Staff Sergeant "Hug" Hoggard's putting his hand on someone of the opposite sex might not be an indecent assault.   However, here there is more—much more.

23.   This case involves an assault offense which is the first in a series of progressively more serious sexual offenses against women. Viewing all of the evidence in the light most favorable to the Government, there is sufficient evidence in the record to sustain appellant's conviction.   Therefore, I would affirm the decision of the court below in its entirety.

24.   I share the Chief Judge's concern that the majority has substituted its judgment for that of the factfinders.   It is particularly troubling when, as here, the majority sets aside a nonconsensual sex-offense

charge without apparently considering the reasonable inferences that could be drawn from all of the facts in evidence. *See, e.g., United States v. Cage,* 42 MJ 139 (1995); *United States v. Hullett,* 40 MJ 189 (CMA 1994). When one draws these inferences, as did the triers of fact, appellant's intent is no mystery.

## I. Standard of Review

25. Rather than considering all of the evidence in context, the majority would build a fence around the assault of SGT MB sometime between December 25, 1990, and March 3, 1991, disregarding the evidence of appellant's lecherous conduct with other female victims. The majority's approach is contrary to *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), where the Court declared:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact-finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citation omitted.)

26. Affirmatively, this is a case concerning the sufficiency of evidence under *Jackson v. Virginia, supra.* It is not a case ultimately concerned with the review of a motion to sever or admissibility of evidence under Mil. R.Evid. 404(b), Manual for Courts–Martial, United States, 1984, but rather involves only charged conduct. *United States v. Ingham,* 42 MJ 218 ¶ 31 (1995). The *Jackson* standard is applied to determine if the elements of the offense have been proven.

## II. Charges

27. Contrary to his pleas, appellant was convicted of the following:

(A) Indecent assault of SGT MB sometime between December 25, 1990, and March 3, 1991;

(B) Indecent assault on Mrs. S sometime between on or about May 1, 1991 and June 30, 1991;

(C) Indecent assault upon Specialist JB sometime between on or about June 13, 1991, and June 26, 1991, by brushing his hand against her buttocks; and

(D) rape and adultery of Mrs. F on August 4, 1991, when he entered her quarters, pushed her into the bathroom, and forced her to engage in sexual intercourse.

## III. Elements of the Offense

28. The elements of indecent *assault* are as follows:

(1) "That the accused *assaulted*" SGT MB, "a certain person not the spouse of" appellant by grabbing her right shoulder with his left hand and attempting to kiss her;

(2) "That the acts were done with the *intent* to gratify the lust or sexual desires of" appellant; and

(3) "That under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of an nature to bring discredit upon the armed forces." Para. 63b, Part IV, Manual, *supra* (emphasis added).

29. An "assault" occurs when "the accused attempted or offered to do bodily harm to a certain person ... with unlawful force or violence." Para. 54b(1), Part IV, Manual, *supra.* The Manual goes on to define "Bodily harm" as "any offensive touching of another, however slight." Para. 54c(1)(a).

30. Two elements are in dispute. First, the question of the "assault"; and second, of appellant's intent. This Court has recognized that the slightest touching is sufficient to constitute an unlawful touching. *United States v. Sever,* 39 MJ 1, 4 (CMA 1994)("kissing, even though it generally only implies a minimum use of force, is sufficient for the offense. *See People v. James,* 9 Cal.App.2d 162, 48 P.2d 1011, 1012 (1935)."). *James* also

stands for the proposition that laying a hand on the person is an unlawful touching. Thus, direct evidence establishes the unlawful touching, and circumstantial evidence may establish his lustful intent.

31. This Court has held on numerous occasions that evidence of other misconduct is admissible to show intent, in this case intent to gratify sexual desires. *See, e.g., United States v. Reynolds*, 29 MJ 105, 109 (CMA 1989) ("Confronted with this classic consent/mistake-of-fact defense, evidence that appellant used the very same method to accomplish his sordid purposes on other occasions was extremely probative of his predatory *mens rea* on the night in question."); *United States v. Cox*, 18 MJ 72, 74–75 (CMA 1984) ("a pattern of lustful intent" was circumstantial evidence relating to all charges in the case).

32. Since the issue of intent is a question of logical relevance, the probative acts may be subsequent to the offense in issue. *United States v. Colon–Angueira*, 16 MJ 20, 25 (CMA 1983) ("Depending upon the circumstances involved in a particular case, subsequent conduct showing a subsequent state of mind may be relevant to show an earlier state of mind at issue."); *United States v. Young*, 906 F.2d 615, 620 (11th Cir.1990); *United States v. Bridwell*, 583 F.2d 1135, 1140 (10th Cir.1978)(subsequent conduct admitted on the question of intent). *See also United States v. Dorsey*, 38 MJ 244 (CMA 1993)(subsequent conduct admitted on the question of intent); *United States v. Levitt*, 35 MJ 114 (CMA 1992)(subsequent conduct admitted on the question of intent).

## FACTS

### (A) SGT MB

33. Sometime between December 1990 and March 1991, SGT MB, a single mother, was driving home when a car started tailgating within 10 feet of her car. That car was operated by appellant. He flashed his head lights and motioned for her to pull over. She did. She exited her car and approached appellant. He asked her to get into his vehicle. She did, and they proceeded to engage in talk. He then "grabbed" her right shoulder with his left hand and moved her towards him. When she turned towards him and was 12 to 13 inches apart, she realized that he wanted a kiss. When that happened, she "told him no" and immediately exited the car.

34. Appellant testified, "We had a little small talk. I was flirting with her and I reached over to put my arm around her to see what the possibilities might be, and when I put my arm around her she relaxed back so I just— Okay." When he put his arm around her, appellant moved physically closer to her. Appellant admitted they were 18 to 20 inches apart. But he stated that he had no criminal intent when he was touching her with his left hand.

35. This was not the first time that appellant had sought out SGT MB. Often he would appear at her house uninvited when she was returning from morning physical training (PT). On some instances she might invite him in but told him that she had to get her daughter ready for preschool. She testified that if he had persisted in coming to her house, she was going to report him.

### (B) Mrs. S

36. The second victim was Mrs. S, appellant's neighbor. Three or four times a week appellant would come to her house uninvited, usually in the morning before she went to work and after appellant's wife had gone to work. He seemed sincerely interested in getting Mrs. S and his wife to begin speaking to each other again. One morning when he came over uninvited, she started to make a cup of coffee. At that time he backed her up against the counter and started "rubbing" himself against her "rear area." He "put his hands on the sink" and blocked her from moving while continuing to rub himself "up against" her. He became "sexually aroused." When the prosecution sought to introduce other evidence concerning his contact with Mrs. S, the judge sustained an objection to the evidence. Appellant responded to this testimony by indicating that they were merely playing and there was no lustful intent.

However, Mrs. S denied they were playfully wrestling.

### (C) Specialist JB

37. A third victim, Specialist JB, testified she was living in New Jersey between June 13–26, 1991. She was stationed with appellant earlier at Fort Hood and worked as a recruiter with the local schools. On many occasions, appellant would make "comments of a sexual nature" to her. On one occasion when they were alone looking out a window, he touched her buttocks while saying "something" to her. She thought it was not accidental. But he testified that it was accidental and that he had no criminal intent. She complained to the Company Equal Opportunity representative because she "had never experienced anything like that before" from someone with whom she was working. Even after this, appellant would make comments to her, such as: "Umm, you look good." On another occasion he came into the office and "grabbed her knee" while she was sitting down with shorts on. Again, she did not think that this was a joke or was done in an accidental manner.

### (D) Mrs. F

38. On August 3, 1991, appellant and his family held an outdoor picnic, "cooking crabs and breakfast" at his house. The invitees included Mrs. F, whose husband was in Korea, her son, and two other families. The picnic continued until around 9:00 p.m., at which time Mrs. F left. Prior to her leaving, appellant sat next to her and rubbed up against her and put his hand on her leg. When she did not object, he thought that was a signal for having sex. Mrs. F left later to put her 3-year-old son to bed. After appellant's wife left to go to New Jersey to get her mother, appellant went to Mrs. F's house at approximately midnight. She heard the door bell ring. When she went to the door, she noticed it was appellant. She was wearing a tank top and panties. She opened the door a little, and he "just kind of pushed the door open." As soon as he was inside the door, he grabbed her shoulders and she tried to push him away. Appellant assured her that it was "OK" because his wife had left. He pushed her back into the bathroom, and she tried to push him away. He tried to guide her into the hallway to the bedroom, according to his testimony, but she resisted; so he pushed her into the bathroom where he pulled down her pants and had sexual intercourse. She told him a number of times to stop and tried to push him away but was unsuccessful.

## DISCUSSION

39. With all due respect, the majority's characterization of this case as an attempted kiss and nothing more truly reminds me of an ostrich with his head in the sand.

40. Quite the contrary, this is a case of a married soldier with wandering hands exploring the potential for sex with four women. His intent is best described by his own testimony. He "put [his] arm around [SGT MB] to see what the possibilities may be," and when he "put [his] hand on [Mrs. F's] leg, and she didn't" object he thought "she wanted to have sex." What a dreamer!

41. The acts of appellant with SGT MB should not be considered in isolation. Generally, the only means of ascertaining an accused's mental state is by drawing inferences from his conduct. When appellant's acts are considered together, one can easily ascertain appellant's state of mind and his true motivation. Further, we do not have to worry about undue prejudicial spillover from uncharged misconduct because permissible inferences can be drawn from charged acts of which appellant was found guilty. *Jackson v. Virginia, supra.* ¶ 25.

42. I would agree with the majority that when a man kisses an intimate friend and has good reason to believe this is agreeable, no offense has been committed. Here, a staff sergeant tailgates a buck sergeant asking her to pull over and then offensively touches her with his left hand on her right shoulder and attempts to bring them together for a kiss. Our statute does not indicate that the offensive touching itself must be sufficiently serious to be made criminal. § 211.1 Comment ¶ 2, ALI Model Penal Code, *reprinted* in ALI *Model Penal Code and Commentaries* (Part II) 185 (1980). Our case law and the Manual for Courts–Martial

are just the opposite. *See also United States v. Bonano–Torres*, 31 MJ 175, 180 (CMA 1990) (touching of woman's blouse but not her person or body was sufficient to constitute "assault").

43. In each instance the circumstances surrounding each crime were similar. Appellant, a married man, sought to gain the trust of the women by engaging in small talk and then, while alone with the women, touches them intimately or suggestively "to see what the possibilities may be." It does not take a leap of faith to determine appellant's intent in each instance.

44. Additionally, this is not a case of the women scheming to make allegations against appellant. There is no indication that these women even knew each other before their allegations were made. In fact, this case centers on the credibility of the four victims and appellant's defenses to their allegations. The court members were in the best position to make that credibility determination as they were to draw reasonable inferences from all of the evidence. We should refrain from substituting our view of social mores governing relationships between men and women from the legitimate inferences and findings of the members. At a time of heightened awareness of and increased vigilance over prohibiting sexual harassment and other nonconsensual sexual behavior between male and female members of the armed forces, it is disappointing that a majority of the Court would move in the opposite direction.

## CONCLUSION

45. Being absolutely confident that the evidence of appellant's guilt is crystal clear, I would affirm the decision below.

SULLIVAN, Chief Judge (dissenting):

46. A court-martial with members properly instructed in the law found appellant guilty of indecent assault. The Court of Military Review reached the same conclusion and additionally concluded that the evidence of record satisfied *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once again, a majority of this Court has substituted its judgment for that of the appropriate factfinders. *See United States v. Cage*, 42 MJ 139 (1995); *United States v. Hullett*, 40 MJ 189 (CMA 1994).

47. I would affirm the decision of the Court of Military Review. It succinctly summarized the law and facts of this case, as follows:

> Before this Court the appellant contends, *inter alia*, that the evidence was insufficient to support a conviction of indecent assault where he merely grabbed a female soldier's shoulder and attempted to kiss her. We disagree. The gravamen of this offense is an intentional act with the specific intent to gratify sexual desires. *See United States v. Rodriguez*, 31 MJ 150, 157 (CMA 1990). The act or acts need not themselves be indecent. The victim in this specification, a junior NCO, perceived that the appellant "wanted a kiss" when he grabbed her shoulder and moved his face to within a foot of hers as they were seated in his car. She pulled away from him and got out of the car. The manner of this nonconsensual touching, appellant's movement toward the victim with the apparent desire to engage in sexual conduct, and the professional and military relationship between the parties were sufficient to satisfy the requirements of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and *United States v. Turner*, 25 MJ 324 (CMA 1987).

Unpub. op. at 1–2.

48. Finally, I must note the decision of this Court in *United States v. Choate*, 32 MJ 423, 427 (CMA 1991). *See also United States v. Sever*, 39 MJ 1, 4 (CMA 1994). *Choate* supports the proposition that all the circumstances surrounding an act must be taken into consideration to determine its indecency. Here, for example, it should be noted that appellant was a married senior enlisted man; he lured a single junior enlisted woman into his car on base at dusk after tailgating her car; and he unexpectedly attempted to initiate sexual activity with a woman he had simply seen at a Halloween party. Characterizing such activity as a mere "attempted kiss" or an "intended kiss with romantic

overtones" (¶ 19) not only understates the evidence of record but ignores the particular military environment in which it took place.* *See United States v. Wheeler*, 40 MJ 242, 247 (CMA 1994); *see also United States v. Clark*, 35 MJ 432 (CMA 1992), *cert. denied*, 507 U.S. 1052, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993).

---

\* "Facts do not cease to exist because they are ignored." Aldous Huxley, "Note on Dogma," *Proper Studies* (1927), *quoted in The Oxford Dictionary of Modern Quotations* 109(12) (Oxford University Press 1991).