# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39661**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Addison W. HARJUNG**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 September 2020

————————————

*Military Judge:* Willie J. Babor.

*Approved sentence:* Dishonorable discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 15 November 2018 by GCM convened at Royal Air Force Lakenheath, United Kingdom.

*For Appellant:* Major David A. Schiavone, USAF; Jonathan W. Crisp, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Charles B. Dunn, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and RAMÍREZ, *Appellate Military Judges.*

Judge RAMÍREZ delivered the opinion of the court, in which Chief Judge J. JOHNSON and Senior Judge POSCH joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RAMÍREZ, Judge:

A general court-martial composed of a military judge sitting alone found Appellant guilty, pursuant to his plea, of one specification of attempted sexual abuse of a child by communicating indecent language (Specification 1 of the Charge) in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] Appellant was also found guilty, contrary to his pleas, of one specification of attempted sexual abuse of a child by touching her breasts and licking her vulva (Specification 2 of the Charge) and one specification of attempted sexual assault of a child by penetrating her mouth with his penis (Specification 3 of the Charge), both in violation of Article 80, UCMJ.[2]

The military judge sentenced Appellant to a dishonorable discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence except the adjudged forfeiture. He also deferred the adjudged and mandatory forfeitures from 29 November 2018 to 7 March 2019, and waived the mandatory forfeiture for a period of six months, with the total pay and allowances directed to be paid to Appellant's wife.

Appellant raises one assignment of error on appeal: whether the evidence is legally and factually sufficient to support a guilty verdict for Specifications 2 and 3.[3] Finding no error, we affirm.

## I. BACKGROUND

Appellant enlisted in the Air Force in February 2015, and was stationed at Royal Air Force (RAF) Lakenheath, United Kingdom. On 20 October 2017, Ap-

---

[1] All references in this opinion to the Uniform Code of Military Justice are to the *Manual for Courts-Martial*, *United States* (2016 ed.).

[2] Specifications 2 and 3 were merged for sentencing purposes.

[3] We note that the convening authority denied Appellant's request to defer the reduction in grade without explaining his reasons. In accordance with *United States v. Sloan*, 35 MJ 4, 7 (C.M.A. 1992), when a convening authority denies a request for deferment, he must do so in writing and include his reasons. This was not raised by Appellant. However, we have independently considered it under the "colorable showing of possible prejudice" standard and are satisfied there is no colorable showing of possible prejudice in this case. *See United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998) (citation omitted); *cf. United States v. Ward*, No. ACM 39648, 2020 CCA LEXIS 305, at *10–11 (A.F. Ct. Crim. App. 3 Sep. 2020) (unpub. op.) (questioning "colorable showing of possible prejudice" standard for *Sloan* errors but applying it for purposes of analysis).

pellant read a "Craigslist" advertisement entitled, "Dependent looking for company, RAF Mildenhall/Lakenheath, UK."[4] Appellant responded to the advertisement stating, "I work on [L]akenheath, AD air force, married but open to chatting and maybe more." Appellant's response began a series of communications over 33 days that led to Appellant's apprehension by special agents of the Air Force Office of Special Investigations (AFOSI) on 21 November 2017.

During an email exchange on 22 October 2017, Appellant was told that "Ellie Smith" was a 14-year-old girl in the 9th grade who lived on base and was a dependent of an active duty servicemember. However, "Ellie Smith"[5] was, in fact, an Internet persona created by Special Agent GS from the local AFOSI detachment. Agent GS posted the advertisement as part of an AFOSI undercover operation to identify adults interested in exploiting children of military members. Agent GS testified that he informed Appellant of "Ellie's" age to ensure that Appellant understood he was communicating with a child. Agent GS explained that he provided several "outs" to ensure that Appellant was leading the online conversations, and that Appellant had opportunities to cease further communication with an individual whom Appellant believed was a child.

After the initial contact, there was a 24-hour break in communication between Appellant and "Ellie" from 22 October 2017 to 23 October 2017 as well as a nine-day break in communication from 23 October 2017 to 2 November 2017. At trial, Agent GS testified that these breaks in communication were because of responsibilities that restricted the agent's ability to respond to Appellant's emails. After both breaks in communication, Appellant reinitiated contact with follow-on messages to "Ellie" after Appellant initially received no response to his emails. From 2 November 2017 until 10 November 2017 Appellant engaged in flirtatious email messaging with "Ellie" via the Craigslist email system that had the underlying theme of using "friends" to keep "warm" during the English winter.

On 10 November 2017, Agent GS—posing again as "Ellie"—asked Appellant to send her a picture of himself. Appellant responded that he did not like to share personal photographs online but offered to exchange photos via "Snapchat." Agent GS testified that he offered to use the "Kik" messaging application because Agent GS had not established a Snapchat account for "Ellie." Appellant agreed and shared pictures of himself, and Agent GS in return sent images of a female AFOSI agent that had been digitally altered to make the agent

---

[4] Quotes from text messages appear in their original form, without correction.

[5] Since "Ellie Smith" was a persona and not a real person, we will refer to her simply as "Ellie."

appear younger. Agent GS, through "Ellie," questioned Appellant if he was "ok that [she was] 14." Appellant responded:

> I like you for you, and I could get in a lot of trouble for "liking" you in that way. That's why I was hesitant about sending a picture. I'm not mad that you're 14, but we could never have a sexual relationship. At least not legally. I like talking to you and you seem very mature for your age which is why I like flirting . . . I generally like girls my age but I like you too . . . [were] you hoping for something more than flirting?

When "Ellie" responded that this sort of talk was new to her, Appellant stated he "would love to do more than flirt, [and] had [she] not told [him] [he]'d have guessed [she] w[as] 18, [because she was] very mature." Appellant asked her, "if you did not want to do more than flirt, what were you hoping for?" Again, Agent GS gave Appellant an "out," responding "I don't know . . . I don't want to get u in trouble." Appellant clarified: "Talking about stuff isn't illegal, just doing the stuff is . . . [I'm] just curious as to what you would do if we were together . . . [s]orry if that sounded creepy."

Yet again, Agent GS gave Appellant an "out," telling Appellant that "someone told [her] that talking to [Appellant] would get them in trouble." Agent GS clarified that this other person "wanted to talk about kissing and sex but said it was illegal." "Ellie" explained to Appellant that she "[didn't] wanna get anyone in trouble." In response, Appellant told "Ellie" he trusted her to keep their communications about sexual matters "our secret." Shortly after this exchange, Appellant's messages became overtly sexual, and included a remark about touching "Ellie's" breasts. Appellant related to her how he "would enjoy taking [her] shirt off and feeling what's underneath . . . maybe kissing there too."

Appellant then directed the conversation to what he and "Ellie" could do if they got together. Appellant suggested getting coffee or going for a walk or a drive, after which they would "take it from there." Appellant asked "Ellie" what her favorite type of Starbucks was, and she responded hot chocolate with mint. Appellant suggested a meeting place that would give them privacy and recommended visiting a duck pond on base. Appellant then messaged "Ellie," telling her he would put his tongue "between [her] legs, [and Appellant] could put [his] tongue where [she] touch[es] [her]self . . . [and Appellant] would gently lick it." Appellant explained "that's how [a lot] of girls have an orgasm . . . [and Appellant] would love to help [her] have [her] first orgasm . . . ." Appellant assured "Ellie" he would "[o]nly get in trouble if [she told] people what [they] do together."

Appellant exchanged another photo with "Ellie" and talked about how he would enjoy being naked in his house with her. Appellant described how "Ellie"

could sit naked on his lap to keep warm because "[s]kin on skin contact generates [a lot] of heat." Later, Appellant messaged he was "sorry if [he] made [her] uncomfortable last time [they] talked . . . . [and] maybe [he] pushed some stuff last time . . . ." Agent GS gave Appellant another "out" by stating, "I feel like [you] might get tired of me because I don't understand everything." Appellant insisted that he "won't get tired of it, [and he] actually really enjoy[ed] teaching and answering questions . . . . Whatever [she]'d like to know."

Appellant's messages to "Ellie" repeated a pattern of beginning with casual conversation that progressed to discussions about kissing and "snuggling" to keep warm. Appellant discussed making out. He also talked about their hands wandering over one another and that it would be something he would be willing to "teach" "Ellie." Appellant then offered that he had a car and they could go somewhere if they wanted. Appellant reasoned that if people questioned why "Ellie" was in Appellant's car he could explain that he was her "babysitter." Appellant told her that she was "[y]oung enough where people wouldn't ask questions," and "old enough to explore [her] sexuality."

Appellant messaged "Ellie" that "[a] good first step would be to explore [her] body . . . ." This initiated a conversation about masturbation. Appellant told "Ellie" that he could touch her vagina and explained, "I could start with my hand, if you like that I could use my tongue." This progressed to Appellant telling "Ellie" she could "[f]eel between [his] legs." Appellant told "Ellie" that if she wanted she could "[p]ut [Appellant] in [her] mouth and pretend it's a lollipop." After Agent GS, messaged, "[h]ey I have to get ready for bed," Appellant responded, "[o]kay sweetie we can talk more about that stuff when we meet."

In subsequent messages, Appellant told "Ellie" what her "next lesson" would be, and mentioned Appellant could pick her up in his jeep and they could kiss. Appellant said he would bring her hot chocolate with mint, and then drive around for a little while and talk. At the end of their meeting, he would drive her home and drop her off close to where she lived. Appellant asked her if she felt comfortable getting in his "big jeep," explaining he was okay with whatever she wanted to do. Appellant offered that if anyone saw them together as he drove around base they could use the excuse that he was just a nice guy giving her a ride in his jeep.

Appellant again turned the discussion to matters of a sexual nature. He told Ellie that when they met, he could use his hands to show her how to touch herself. Appellant explained that the seats fully reclined in his jeep, and told "Ellie" he "could rub [her] boobs, give [her] kisses, [and they] could make out, [and do] anything [she]'d like to try." Appellant related that "guys like having there penises touched, [and] if [she] wanted [Appellant] could show [her] how?" Shortly after this discussion, Agent GS gave Appellant another "out," telling

him, "[i]f you feel like you shouldn't talk to me because u said it's wrong I understand. Really." Nonetheless, Appellant continued, telling "Ellie" he "would like to feel [her] boobs, maybe [her] vagina" and "[i]f [she] were okay with it, [Appellant] would like to lick [her] vagina too." Appellant proposed they could "[f]ind a place where nobody could see [them together]."

Following some extended conversation with "Ellie" and a discussion of potentially limiting their first in-person meeting to getting ice cream, Appellant returned to discussing sexual things such as licking "Ellie's" vagina, putting his penis in her mouth, and taking condoms to their first meeting to alleviate "Ellie's" fear of performing oral sex and getting a sexually transmitted disease.

On 19 November 2017, Appellant and "Ellie" finalized plans to meet two days later. Appellant explained he would drive his jeep with the "reclining seats," and bring "Ellie" a present, possibly a "blue and green" necklace, and a Starbucks peppermint hot chocolate. They originally agreed to meet in the dorm parking lot across the street from the high school. However, on the day of the scheduled meeting, "Ellie" changed the meeting location to a duck pond.

Appellant was apprehended at the duck pond on 21 November 2017. Following his apprehension, another AFOSI agent searched Appellant's car and observed two Starbucks beverages, one that smelled like a regular coffee and the other like mint and chocolate. The agent also found a blue and green butterfly necklace with a receipt showing it had been purchased just a few days earlier. The agent also found an unopened box of condoms in the center console. AFOSI agents observed that the seats in Appellant's jeep fully reclined.

At trial, Agent GS explained that he mentioned "Ellie's" age and gave Appellant an "out" on approximately eight to ten occasions. The agent estimated Appellant introduced sexual activity or conversations of a sexual nature on approximately 18 to 20 occasions before Appellant was apprehended and learned that "Ellie" was the persona of an AFOSI agent.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United*

*States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the court is convinced of the accused's guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (internal quotation marks and citation omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

The elements of attempted sexual abuse of a child as alleged in Specification 2 of the Charge are that: (1) at or near RAF Lakenheath, United Kingdom, on or about 21 November 2017, Appellant did a certain overt act; (2) that the act was done with the specific intent to commit lewd acts upon "Ellie Smith," a person whom Appellant believed to be a child who had not attained the age of 16 years, by touching "Ellie Smith's" breasts and licking her vulva, with an intent to gratify Appellant's sexual desire; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the offense of sexual abuse of a child. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶¶ 4.b, 45b.b.(4)(a).

The elements of attempted sexual assault of a child as alleged in Specification 3 of the Charge are that: (1) at or near RAF Lakenheath, United Kingdom, on or about 21 November 2017, Appellant did a certain overt act; (2) the act was done with the specific intent to commit a sexual act upon "Ellie Smith," a person whom Appellant believed to be a child who had attained the age of 12 years but had not attained the age of 16 years, by penetrating "Ellie Smith's" mouth with his penis; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the offense of sexual assault of a child. *See MCM*, pt. IV, ¶¶ 4.b, 45b.b.(3)(a).

"That a crime is comprised of both an actus reus and a mens rea necessarily means both components must exist at the time an offense is committed if the offense is to amount to a crime at all." *United States v. Rodriguez*, 79 M.J. 1, 3 (C.A.A.F. 2019) (citations omitted). "To constitute an attempt there must be a

specific intent to commit the offense accompanied by an overt act which directly tends to accomplish the unlawful purpose." *MCM*, pt. IV, ¶ 4.c.(1). "The overt act must be more than mere preparation to commit the offense." *United States v. Byrd*, 24 M.J. 286, 289 (C.M.A. 1987) (citation omitted). Our superior court (formerly the Court of Military Appeals, now the United States Court of Appeals for the Armed Forces), has interpreted this as requiring that the accused take a "substantial step" toward the commission of the crime. *United States v. Jones*, 37 M.J. 459, 461 (C.M.A. 1993) (citing Article 80, UCMJ; *United States v. Schoof*, 37 M.J. 96, 102 (C.M.A. 1993)). To constitute a substantial step, the overt act must amount to "more than mere preparation" and "unequivocally demonstrat[e] that the crime will take place unless interrupted by independent circumstances." *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (alteration in original) (internal quotation marks and citation omitted). "[A] substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent." *Byrd*, 24 M.J. at 290 (citations omitted). However, the explanation section of Article 80, UCMJ, states that "[t]he overt act need not be the last act essential to the consummation of the offense." *MCM*, pt. IV, ¶ 4.c.(2); *see also United States v. Thomas*, 32 C.M.R. 278, 288 (C.M.A. 1962) ("[T]he overt act need not be the last proximate act to the consummation of the offense attempted to be perpetrated.").

"Intent can be shown by circumstantial evidence." *United States v. Acevedo,* 77 M.J. 185, 189 (C.A.A.F. 2018) (citing *United States v. Vela*, 71 M.J. 283, 286 (C.A.A.F. 2012)). "Although a criminal actor must possess the requisite intent when he commits a criminal act, circumstantial evidence—from before or after the act—may be used to prove an actor had the requisite intent at the time of the act." *Rodriguez*, 79 M.J. at 3 (citations omitted). "The conduct of the parties within a reasonable time before and after [an act] are circumstances which a [factfinder] may consider in determining such intent, motive or purpose." *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962) (citation omitted). "Intent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." *United States v. Braddock*, No. ACM 39465, 2019 CCA LEXIS 441, at *13 (A.F. Ct. Crim. App. 29 Oct. 2019) (unpub. op.) (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (other citation omitted)), *rev. denied,* 2020 CAAF LEXIS 78 (C.A.A.F. 2020).

The concept of "voluntary abandonment" may act as an affirmative defense." *Byrd*, 24 M.J. at 292–3. However, "[v]oluntary abandonment is not an affirmative defense to attempted criminal conduct where the actor's purposes

were frustrated by external forces, such as fear of immediate detection or apprehension." *United States v. Miller*, 30 M.J. 999, 1000 (N.M.C.M.R. 1990) (citations omitted).

**2. Analysis**

In attacking the sufficiency of the evidence, Appellant essentially makes the same argument that his trial defense counsel made in closing argument at trial. Appellant concedes to the evidence AFOSI agents found in his jeep and attacks the intent associated with the items in his jeep, his actions, and his messages to "Ellie." Specifically, Appellant denies he ever had the specific intent to engage in sexual acts when he carried out his plan to meet with "Ellie."

Appellant concedes that he had made comments and statements about initiating sexual acts with "Ellie" and that he may very well have intended to engage in a sexual relationship with her at some point in the future. Additionally, Appellant concedes that he repeatedly expressed a desire to kiss "Ellie" when they met. However, Appellant argues that his last discussion of a sexual nature with "Ellie" occurred on 18 November 2017, three days prior to the meeting Appellant arranged, and, therefore, the passage of time dissipated his specific intent and the evidence is insufficient to support a conclusion that he intended to perform any of the alleged acts with "Ellie" on the evening of 21 November 2017 when he was apprehended.

We find the evidence at trial is contrary to this position and that the passage of time did not dissipate Appellant's specific intent. Agent GS testified that Appellant initiated sexual discussions with "Ellie" between 18 and 20 times during their online conversations. These discussions include numerous references to Appellant's intent to touch "Ellie's" breasts and lick her vagina. The evidence showing how these actions would gratify his sexual desires include him telling "Ellie" that he would "like," "enjoy," or "love" doing those things when they met in person. Additionally, during those discussions with "Ellie," which contemplated an in-person meeting between them, Appellant referenced his penis and told her that she could "feel it with [her] hands" or "try putting it in [her] mouth." These repeated explicit online conversations followed the similar pattern of progression from a casual conversation, to talking about kissing and cuddling, and finally to explicit sexual conversations directed at what Appellant would do with "Ellie" when they met in person for the first time.

Appellant accepts that this record of extensive online conversations—discussing his desires and intentions to touch "Ellie's" breasts, lick her vagina, and penetrate her mouth with his penis—may be proof of a "future" intent to do those things. However, Appellant cites no legal precedent for the proposition that a short gap in those repeated and graphic statements negates Appellant's

intent to commit the offenses. While there is no legally recognized amount of time that may elapse between the forming of intent and the dissipation of the intent,[6] the three days here between the last direct evidence of intent and the meet up do not convince us of dissipation in light of the circumstantial evidence.

Appellant does not dispute that he showed up to meet "Ellie" with Starbucks drinks, a necklace, and a box of condoms in a jeep with reclining seats. Instead, Appellant argues these actions do not establish the specific intent required to prove the offenses of which he was found guilty. Appellant essentially attempts to negate his intent by parsing his actions before the arranged meeting. He argues that taking coffee and a gift, and being a married man with condoms in his vehicle, does not equate to having a specific intent to sexually assault or abuse a child. He argues that driving a jeep with reclining seats does not equate to an intent to engage in sexual conduct with a child. However, it is clear that Appellant's sexually explicit references about what Appellant wanted to do to "Ellie," and what he wanted her to do to him, were intertwined with conversations about what he would bring. It is unreasonable to conclude that Appellant acted on his stated intent to show up with coffee, a gift, and a box of condoms, but at the same time had relinquished his intent to touch "Ellie's" breasts, lick her vagina, or put his penis in her mouth, which were among Appellant's stated reasons for the meeting he arranged. "[E]vidence cannot be viewed in a vacuum. It must be considered together with all the evidence adduced in determining whether the record as a whole establishes the accused's guilt beyond a reasonable doubt." *United States v. Bermudez*, 47 C.M.R. 68, 71 (A.F.C.M.R. 1973) (citations omitted). Each one of these items is clear evidence that Appellant was more than merely preparing to sexually abuse "Ellie." Purchase of "Ellie's" favorite drink, a necklace, and the taking of a box of unused condoms to the meeting location constitutes substantial steps necessary for an attempt conviction.

Appellant next argues that he expressed to "Ellie" that "we could never have a sexual relationship" because it would be illegal, but that he did enjoy flirting. Appellant argues this negates any specific intent to commit the offenses. However, Appellant's argument does not take into account that Appellant persistently stressed privacy and secrecy in his conversations with "Ellie," stating that he would only get in trouble if "someone saw them" or "someone found out" about them. Specifically, Appellant told "Ellie" that they could never have a sexual relationship, "[a]t least not legally." Additionally, he told her

---

[6] In *United States v. Hoggard*, a three- to six-month separation between state-of-mind evidence to actus reus was too attenuated to "illuminate [an] appellant's state of mind at the time he attempted" the actus reus. 43 M.J. 1, 4 (C.A.A.F. 1995).

that he could "[o]nly get in trouble if [she told] people what [they] d[id] together." Appellant explained that if people saw them together, he could say he was her "babysitter." As previously discussed, the extensive record of messages exchanged between Appellant and "Ellie" repeatedly turned sexual in nature, with Appellant explicitly stating what sexual acts he intended to do when they met in person for the first time. There is no evidence within the record that Appellant ever abandoned this intent prior to his arrest on 21 November 2017. *See Byrd*, 24 M.J. at 292; *Miller*, 30 M.J. at 1000 (citations omitted).

Considering the evidence presented at trial in the light most favorable to the Prosecution, a reasonable factfinder could find beyond a reasonable doubt that Appellant had the specific intent to touch "Ellie's" breasts, lick her vulva, and penetrate her mouth with his penis when he showed up to meet her in his jeep. Additionally, after weighing the evidence and making allowances for not having personally observed the witnesses, and taking a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt to make our own independent determination, we are convinced of Appellant's guilt beyond a reasonable doubt.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court